SLT:TRP
F.# 2012R00340

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M 12- 222

\- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

\- against -

ANTHONY CABRERA,
FRANK J. FARELLA,
ROSEMARIE PECORINO,
EDWARD WARREN and
FRANK VINCENT,

Defendants.

\- - - - - - - - - - - - - - - - - X

**COMPLAINT**

(Title 21, U.S.C., § 843(a)(3))

EASTERN DISTRICT OF NEW YORK, SS:

JOSEPH A. BARBATO, being duly sworn, deposes and states that he is a Diversion Investigator assigned to the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such:

Upon information and belief, on or about and between August 1, 2009 and February 28, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANTHONY CABRERA, FRANK J. FARELLA, ROSEMARIE PECORINO, EDWARD WARREN and FRANK VINCENT, together with others, did knowingly and intentionally obtain possession through misrepresentation, fraud, deception and subterfuge, quantities of oxycodone, a Schedule II controlled substance.

(Title 21, United States Code, Section 843(a)(3)).

The source of Your deponent's information and the grounds for his belief are as follows:[1]

1. I am a diversion investigator with the DEA, duly appointed according appointed according to law and acting as such. I have been a diversion investigator with the DEA for approximately twenty-two years. My primary responsibility is to investigate the diversion of legally manufactured controlled substances into the illicit market. I have had experience investigating cases in which Schedules II through V controlled substances have been purchased from complicit doctors and sold to abusers of those substances. I have been involved in numerous investigations involving the diversion of legitimate pharmaceuticals for recreational use. Through this experience, I have investigated cases involving the theft of prescription pads, the diversion of prescriptions, the forgery of prescriptions and "prescription shopping" cases, i.e., case in which an individual visits one or more doctors and obtains multiple prescriptions for a controlled substance.

2. My information in this case comes from my direct participation in the investigation, a review of DEA records,

---

[1] The facts set forth in this Affidavit are based, in part, on my personal observations and experience, conversations with law enforcement officers and my review of documents and records pertinent to this case. Because the purpose of this Affidavit is to set forth only those facts necessary to establish probable cause, I have not described all of the relevant facts of which I am aware. Conversations described herein are related in sum and substance.

discussions with other DEA agents, discussions with agents from the United States Department of Health and Human Services Office of the Inspector General's Office of Investigations ("OIG") and discussions with confidential sources whose information has proven to be reliable in the past and has been corroborated by independent evidence. During the course of my career, I have participated in: (a) numerous narcotics investigations; (b) debriefings of cooperating witnesses and informants involved in the narcotics and money laundering business; and (c) executions of search and arrest warrants in narcotics and money laundering cases.

3. Prescriptions written by physicians are written on what is commonly referred to as "prescription pads." A doctor licensed by the State of New York and the DEA to write controlled substance prescriptions may order pre-printed prescription pads. Each pad contains 100 prescriptions with a serial number, the doctor's name, a bar code, the doctor's license number, and the address used by the doctor on his/her DEA registration. The doctor issuing the prescription must fill in, among other things, the patient's name, the drug prescribed and the quantity of drug prescribed.

4. Electronic Medical Records or "EMRs" are provided by New York State to, among other medical institutions, hospitals, for the purpose of issuing prescriptions. The EMR, like a prescription, contains a serial number and a bar code. A doctor

issuing a prescription at a hospital must input all of the remaining information, including the doctor's name, address, DEA registration number, patient's name, drug prescribed and the quantity.

BACKGROUND OF THE INVESTIGATION

5. In or about ~~December 2011~~ the Fall of 2011, during the course of an ongoing investigation into the diversion of oxycodone and other controlled substances, and based on information received from a confidential informant (the "CI"), whose information has been shown to be reliable and corroborated by other facts, DEA learned that defendants FRANK FARELLA ("FARELLA"), EDWARD WARREN ("WARREN") and FRANK VINCENT ("VINCENT") and others were obtaining oxycodone from numerous pharmacies in Brooklyn, Queens and Staten Island, by presenting fraudulent prescriptions (hand-written and EMR's) and paying for the oxycodone with either cash or Medicaid cards. The CI advised agents, in sum and substance, that as part of this scheme, defendant FARELLA and others obtained access to blank fill-in prescription pads from a medical facility and gained access to computer software and/or printers which allowed defendant FARELLA to create and print the prescriptions in various names. The CI further advised agents, in sum and substance, that it was also part of the scheme that defendant FARELLA and his co-conspirators recruited others to allow defendant FARELLA to create both fill-in and EMR prescriptions in their names so that they could fill the

prescriptions at various pharmacies, obtain the oxcodone and then give the oxycodone to defendant FARELLA and his co-conspirators for distribution to customers. The CI's information has been corroborated by independent evidence obtained during the DEA's investigation, including surveillance and witness interviews, as detailed below.

6. In December 2011, I obtained records from the New York State Department of Health's Bureau of Narcotic Enforcement ("BNE"), which is responsible for maintaining records of all controlled substance prescriptions filled at pharmacies in New York State. The BNE records contain the following: (a) the serial number found on the prescription; (b) the date the prescription was written; (c) the date the prescription was filled; (d) the name of the prescribing physician; (e) the type and quantity of drug prescribed; (f) the name of the patient; (g) the method of payment; and (h) the pharmacy at which the prescription was filled. In reviewing these records, I observed the following:

(a) Between August 2009 and October 2011, defendant FARELLA obtained approximately 9,070 oxycodone tablets, which tablets consisted primarily of oxycodone 30 mg tablets, the most commonly diverted form of oxycodone and the form most abused by oxycodone addicts. The prescriptions purported to be issued from approximately twelve different physicians and were filled at approximately twenty different pharmacies;

(b) Between October 2010 and October 2011, defendant WARREN obtained approximately 1,980 oxycodone tablets, which tablets consisted primarily of oxycodone 30 mg tablets. The prescriptions purported to be issued from approximately three different physicians and were filled at approximately five different pharmacies; and

(c) Between March 2010 and December 2011, defendant VINCENT obtained approximately 8,248 oxycodone tablets, which tablets consisted primarly of oxycodone 30 mg tablets. The prescriptions purported to be issued by approximately 6 different physicians and were filled at approximately 9 different pharmacies.

7. As a result of the BNE data, I and other DEA agents interviewed pharmacists at approximately eighteen pharmacies in Queens, Staten Island and Brooklyn. At each pharmacy, we requested the original prescriptions issued to defendants FARELLA, WARREN and VINCENT. In total, we obtained approximately fifty-four oxycodone prescriptions in the name of "Frank Farella," approximately twelve oxycodone prescriptions in the name of "Edward Warren" and approximately fifty-two oxycodone prescriptions in the name of "Frank Vincent." These prescriptions range in date from August 2009 through December 2011.

8. Using the BNE data and the prescriptions obtained from the pharmacies referenced above, between August 2009 and the

present, defendants FARELLA, WARREN and VINCENT obtained a total of approximately 25,000 tablets of oxycodone.

9. In or about December, 2011, I and other DEA agents spoke with pharmacists at two of the above-mentioned pharmacies located in Brooklyn, New York. The pharmacists provided DEA with their records relating to prescriptions filled at the pharmacy in the names of defendants FARELLA, WARREN and VINCENT. My review of these records revealed that the individuals who had come to the pharmacy to fill those prescriptions had presented a driver's license and/or other picture identification bearing the names of either defendant FARELLA, WARREN or VINCENT. In addition, the pharmacists viewed photographs of defendants FARELLA, WARREN and VINCENT and confirmed that they were the individuals who had come to the pharmacy and filled the above-referenced prescriptions.

10. On or about December 20, 2011, I and other DEA agents interviewed a doctor whose name had appeared on numerous prescriptions filled by the above defendants (hereafter Doctor #1). Doctor #1 is a general practitioner in Brooklyn, New York. Doctor #1 stated that defendant VINCENT had been a patient of his and that he had prescribed defendant VINCENT oxycodone in the past. On February 7, 2012, I showed Doctor #1 the EMR prescriptions written in the name of defendant WARREN which were purportedly written by Dr. #1. Doctor #1 stated that he had not written any of those prescriptions nor was defendant WARREN ever his patient. He

further stated that, of the fifty-three prescriptions written in Doctor #1's name for oxycodone issued to defendant VINCENT, only ten prescriptions were legitimate prescriptions that Doctor had written for defendant VINCENT for oxycodone; the remaining forty-three were fraudulent. My review of these forty-three prescriptions has revealed that all were EMRs, i.e. prescriptions written from a hospital. Doctor #1 further stated that he did not have hospital privileges and thus, could not have written any of the forty-three EMR prescriptions.

11. On or about December 20, 2012, I and other DEA agents interviewed a doctor whose name had appeared on numerous prescriptions filled by the above defendants (hereafter Doctor #2). Doctor #2 is a general practitioner with offices in Queens and Staten Island, New York. Doctor #2 stated that defendant FARELLA had been a patient of his and that he had prescribed defendant FARELLA oxycodone in the past. On February 7, 2012, I showed Doctor #2 the prescriptions that were issued in the name of the defendants which purportedly were written by Doctor #2. Doctor #2 stated that he had never written a prescription for defendant WARREN. He further stated that, of the thirty-six prescriptions written in Doctor #2's name for oxycodone issued to defendant FARELLA, only nineteen prescriptions were legitimate prescriptions that Doctor #2 had written for defendant FARELLA for oxycodone, and that the remaining seventeen prescriptions were fraudulent. My

review of these seventeen prescriptions has revealed that all were EMRs, i.e. prescriptions written from a hospital. Doctor #2 further stated that he did not have hospital privileges and thus, could not have written any of the EMR prescriptions.

12. The investigation has further revealed that on November 3, 2011, defendants FARELLA and WARREN were arrested by police officers with the New York City Police Department after the officers recovered oxycodone pills and untaxed cigarettes inside of the car in which they were driving.

13. In addition, I and other agents have conducted surveillance of defendants FARELLA, WARREN AND VINCENT on several dates, and have observed FARELLA and others, including WARREN and VINCENT, travel together to pharmacies to have prescriptions filled.

14. On or about January 24, 2012, at approximately 10:35 a.m., DEA agents conducted surveillance of FARELLA at his residence in Brooklyn, New York and agents observed defendant FARELLA drive to a location in Brooklyn and meet with a female ("Female"). Agents observed the Female enter FARELLA's vehicle and observed FARELLA drive with her to a pharmacy located in Brooklyn. Agents observed the Female enter the pharmacy while defendant FARELLA waited outside. Thereafter, agents observed the Female walking away from the pharmacy while carrying a small white bag and then enter defendant FARELLA's vehicle. Agents subsequently followed

defendant FARELLA's vehicle to a location in Brooklyn, where agents observed the Female exit FARELLA's vehicle and enter a Nissan Maxima ("Maxima") which had parked alongside FARELLA's vehicle, and was driven by an unidentified male ("UM"). The Female remained inside the Maxima for a couple of minutes, then exited the Maxima and returned to defendant FARELLA's vehicle. Agents continued surveillance of defendant FARELLA's vehicle and followed it to the parking lot of the Comfort Inn hotel in Queens, New York. Agents observed a male, later identified as the defendant ANTHONY CABRERA ("CABRERA"), approach defendant FARELLA's vehicle and engage in conversation. Minutes later, defendant FARELLA drove away in his vehicle.

15. As part of the investigation, agents continued surveillance at the Comfort Inn. DEA's investigation revealed that defendant FARELLA paid for a room at the Comfort Inn listed under the name "Rosemarie Pecorino," and that he regularly frequented the hotel. Through surveillance, agents observed a female, later identified as defendant ROSEMARIE PECORINO ("PECORINO") at the hotel, and also learned that CABRERA also stayed in the hotel room with PECORINO. Agents were advised by Comfort Inn staff, in sum and substance, that PECORINO and CABRERA had a laptop in their hotel room and would limit the hotel's cleaning staff from entering the room. In addition, a review of CABRERA's criminal record revealed that in January 2012, CABRERA was arrested by police

officers with the New York City Police Department for possession of approximately 166 blank fill-in prescriptions and for possession of a controlled substance.

16. The investigation further revealed that PECORINO and CABRERA checked out of the Comfort Inn on or about February 25, 2012, and checked into the Lyghthouse Inn, which is a hotel located behind the Comfort Inn.

17. On or about March 2, 2012, DEA agents obtained and executed a search warrant issued on March 2, 2012 by the Honorable Roanne L. Mann in the United States District Court for the Eastern District of New York, for Rooms 132, 148 and 208 at the Lyghthouse Inn. Following a search of the hotel rooms, agents observed hundreds of prescriptions filled out in various names, over 20 fraudulent identification cards and Medicaid cards, two laptop computers, a printer and other items inside of the hotel rooms. Agents observed defendants PECORINO and VINCENT inside of the hotel rooms, and they were placed under arrest. On or about March 3, 2012, agents arrested defendants CABRERA, FARELLA and WARREN.

WHEREFORE, your deponent respectfully requests that the defendants ANTHONY CABRERA, FRANK J. FARELLA, ROSEMARIE PECORINO, EDWARD WARREN and FRANK VINCENT be dealt with according to law.

JOSEPH A. BARBATO
Diversion Investigator
Drug Enforcement Administration

Sworn to before me this
3rd day of March, 2012

S| Levy

HONORAB
UNITED DGE
EASTERN K